**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:16-cv-00304-MR-WCM**

| | |
|---|---|
| JUDESHIEA QUARLES,       ) | |
|          ) | |
|      Plaintiff,    ) | |
|          ) | **MEMORANDUM OF** |
|    vs.     ) | **DECISION AND ORDER** |
|          ) | |
|          ) | |
| C.W. WEEKS,        ) | |
|          ) | |
|      Defendant.   ) | |
| _____  ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 36].

## I.    PROCEDURAL BACKGROUND

The Plaintiff Judeshiea Quarles ("Quarles" or "Plaintiff") initiated this action in the Rutherford County General Court of Justice, Superior Court Division, on July 14, 2016, asserting claims stemming from his arrest which he asserts was made without probable cause. In the original Complaint, the Plaintiff brought claims against the arresting officer, Defendant C.W. Weeks ("Officer Weeks" or "Defendant"), in his individual capacity for malicious prosecution under North Carolina law and pursuant to 42 U.S.C. § 1983 for

violation of the Plaintiff's rights under the Fourth Amendment. [Doc. 1-1]. The Defendant removed the action to this Court on September 13, 2016. [Doc. 1].

Following removal, the Defendant filed a Motion to Dismiss. [Doc. 4]. The Plaintiff, in turn, filed an Amended Complaint to assert an official capacity claim under state law against the Defendant. [Doc. 5]. The Court then denied the Defendant's Motion to Dismiss as moot based upon the filing of the Amended Complaint. [Doc. 6]. The Defendant subsequently filed a Motion to Dismiss Plaintiff's Amended Complaint [Doc. 8], which was granted in part and denied in part. [Doc. 21]. Specifically, the Court dismissed the state law malicious prosecution claim asserted against the Defendant in his official capacity, leaving only the claims as asserted in the Original Complaint. [Id.].

The Defendant now moves for summary judgment with respect to these remaining claims. [Doc. 36]. The Plaintiff has filed a Response in opposition [Doc. 43], and the Defendant has filed a Reply [Doc. 46]. Having been fully briefed, this motion is ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record or by showing that the adverse party cannot produce admissible evidence to support that fact. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams v. Trustees of Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff as the non-moving party, the following is a recitation of the relevant facts.

On February 5, 2012, after spending the weekend in South Carolina, Crystal Shytles ("Shytles") returned to her home on Arlington Street in Forest City, North Carolina, to discover that a breaking and entering and larceny had occurred in her absence.  [Deposition of Crystal Shytles ("Shytles Dep."), Doc. 43-2 at 18-20].  Shytles reported the crime to the Forest City Police Department ("FCPD").  [Id.].  Patrol officer S.D. Bailey went out to meet with Shytles.  [Id.; Deposition of Brian Gooch ("Gooch Dep."), Doc. 43-3 at 25-26].  Shytles showed Bailey the condition of her house and detailed the stolen items, including a nineteen-inch television, a laptop computer and its charger, and her grandmother's princess ring.  Shytles also noted that her wooden door frame and porch screen were damaged. [Shytles Dep., Doc. 43-2 at 20-21; Gooch Dep., Doc. 43-3 at 26; Feb. 5, 2012 Investigation Report, Doc. 43-4].  Later that same evening, Shytles called the police again to report that a computer printer, a MP3 player, numerous CDs, and a suitcase were also missing from her home.  [Shytles Dep., Doc. 43-2 at 21-23; Gooch Dep., Doc. 43-3, at 28; Feb. 5, 2012 Supp. Investigation Report,

Doc. 43-5]. The following morning, Shytles called the police again to report that a French door was damaged and that she found a red cloth rag left behind by the perpetrators. [Shytles Dep., Doc. 43-2 at 22-23; Gooch Dep., Doc. 43-3 at 30; Feb. 6, 2012 Supp. Investigation Report, Doc. 43-6]. After the investigation commenced, Shytles also reported to the FCPD that her son-in-law noticed tools and other items, including a battery charger, screwdrivers, and batteries, missing from the basement. [Investigator's Notes, Doc. 43-7 at 1].

Assistant Chief Bob Ward assigned the investigation to Officer Brian Gooch ("Officer Gooch"). [Gooch Dep., Doc. 43-3 at 24]. Officer Gooch began to investigate leads and collect information about the crime. [Affidavit of Brian Gooch ("Gooch Aff."), Doc. 39-3 at ¶ 4].

When Gooch spoke with Shytles, he asked her to identify anyone who had recently visited or stayed in her home or trespassed on her property. [Shytles Dep., Doc. 43-2 at 25-30]. Shytles identified four individuals as potential suspects. [Id.]. After speaking with Shytles, Officer Gooch then contacted Shytles' next-door neighbor, Patty Bond ("Bond"). [Incident Report, Doc. 43-4; Investigator's Notes, Doc. 43-7 at 1-2]. Bond reported to Gooch that on the day in question, she saw two skinny, light-skinned black males leave Shytles' house around 5:30 a.m., and that one was carrying a

laptop computer.  [Gooch Dep., Doc. 43-3 at 32; Incident Report, Doc. 43-4].

Bond reported that the two men got in a four-door, black car parked in

Shytles' driveway and watched something on the laptop, with the computer

screen casting a light in the car.  [Gooch Dep., Doc. 43-3 at 32; Incident

Report, Doc. 43-4]. Bond said the suspects then went back into the house,

turned the lights on and off in each room, and then drove off.  [Gooch Dep.,

Doc. 43-3 at 32; Incident Report, Doc. 43-4].[1]

Bond viewed a photo lineup of potential suspects on February 13,

2012.  [FCPD Line Up Procedures Memo, Doc. 39-5].  At that time, Bond

identified an individual named E.J.[2] as a suspect with 90% certainty  [Id.].

Officer Gooch ultimately ruled E.J. out as a suspect because Officer Gooch

had placed E.J. in the lineup merely as "a filler" and E.J. had not been in any

legal trouble in the area for almost ten years.  [Gooch Dep., Doc. 43-3 at 59].

Bond also reported on two occasions that she saw the car involved in the

break-in driving around the neighborhood.  A license plate search of each

---

[1] Bond testified at a subsequent probable cause hearing that she did not call the police when she observed this happening because she thought the two individuals may have been friends who were staying at the house with Shytles' permission.  [Prob. Cause Hrg. Transcript, Doc. 39-13 at 16-17].

[2] The Court has abbreviated this name as E.J. is not a party to this action.

car she identified, however, showed that the owners were a white man and a white woman, respectively. [Gooch Dep., Doc. 43-3 at 46-50].

Officer Gooch also investigated the four individuals previously identified by Shytles but dismissed them all as potential suspects. [Gooch Dep., Doc. 43-3 at 37-39, 45]. After clearing those individuals and investigating the leads provided by Bond, Gooch closed the investigation on February 15, 2013, a year after the break-in. [Id. at 51-52; February 15, 2013, Supp. Investigation Report, Doc. 43-14; Investigator's Notes, Doc. 43-7 at 8]. Just days after closing the investigation, Gooch left the Forest City Police Department for a position with the Rutherford County Sheriff's Office. [Gooch Dep., Doc. 43-3 at 7].

Sometime after the investigation had closed, Bond mentioned to Shytles an incident that had occurred previously at Shytles' home. Bond stated that a man had come to assist two of Shytles' friends, Amie Cooper ("Cooper") and Jeff Smith ("Smith"), with changing a tire on Smith's vehicle, and that "it looked like" this man was one of the individuals whom Bond had seen on the morning in question. Having not heard of this incident before, Shytles asked Cooper about it. Cooper informed her that the man who had come to assist Smith with the tire was "Dee Quarles." [Shytles Dep., Doc. 43-2 at 38].

On February 25, 2013, Shytles called the FCPD. She reported to Lieutenant Eric Shelton that her friend had told her that Quarles had been at her home *two weeks prior* to the break-in, and that Shytles' neighbor (Bond) could identify the suspect. [Supp. Investigation Report, Doc. 43-15].[3]

With this information, the case was reopened and Lieutenant Shelton met with Quarles at his mother's house on March 6, 2013 to discuss the breaking and entering and larceny. [Quarles Dep., Doc. 39-7 at 105-07]. Quarles recounted this interview in his deposition as follows:

> Q. Okay. And did he – did he say – did he say anything about you ever being at the victim's residence at any point in time?
>
> A. He [Lt. Shelton] said something about changing a tire.
>
> Q. Okay. And then what – do you remember what he said about changing the tire?
>
> A. He said I was at somebody's house on Arlington Street changing a tire, and I told him no, I don't remember being no Boy Scout to nobody.

---

[3] Bond was familiar with both Cooper and Smith. Bond had worked at a pawn shop in Spartanburg for Cooper and Cooper's then-husband. [Shytles Dep., Doc. 43-2 at 32]. When Cooper and her husband later separated, Cooper spent some time at Shytles' home. [Id.]. Cooper then rekindled a romance with her high school sweetheart, Smith, who would stop by Shytles' home to visit Cooper. [Id.]. As Shytles' next-door neighbor and Cooper's employee, Bond knew about Cooper's budding relationship with Smith. [Id.]. Quarles was also familiar with Cooper and Smith, as Smith's brother, Ivey, owned a competing pawn shop in Forest City, and Quarles worked there as a manager for a period of time. [Deposition of Judeshiea Quarles ("Quarles Dep."), Doc. 43-16 at 72-73].

> Q.    Uh-huh.  And what do you mean by being no Boy Scout to nobody?
>
> A.    Good Samaritan.
>
> Q.    Okay.  So does that – so does that mean you did not remember changing someone's tire on Arlington Street?
>
> A.    Yes.  I didn't do it.  Yes.  I didn't change no tire. I don't remember nothing like that.

[Id. at 108; Mar. 6, 2013 Supp. Investigation Report, Doc. 43-17].  At that meeting, Quarles denied ever being at Shytles' home or even knowing where Arlington Street is.[4]  Quarles also offered to take a polygraph test.  [Quarles Dep., Doc. 39-7 at 107; Mar. 6, 2013 Supp. Investigation Report, Doc. 43-17].

The case was then assigned to the Defendant, Officer C.W. Weeks. On March 7, 2013, Officer Weeks spoke with Shytles, who stated that "she found out that Judeshiea Quarles had been in her house *two weeks prior* to

---

[4] In fact, Quarles had been to Shytles' home.  Quarles testified at his deposition that Jeff Smith had called his brother, Ivey, for whom Quarles worked, and asked his brother to bring him an air compressor to pump up a tire.  Ivey Smith asked Quarles to deliver the air compressor to Jeff Smith while on his lunch break.  Ivey Smith gave Quarles the address of Shytles' home, but because Quarles was not familiar with the area, he relied on landmarks to find the house.  Once there, Quarles waited inside the house with Amie Cooper until Jeff Smith was done using the air compressor.  He then returned to work. [Quarles Dep., Doc. 39-7 at 109-10].  There is no indication in the record, however, that Quarles relayed any of this to Lt. Shelton.

her residence being broken into." [Investigator's Notes, Doc. 39-8 at 1 (emphasis added)]. On April 15, 2013, Weeks completed a photo lineup including Quarles. Another officer went and showed the lineup to Bond, who identified Quarles as one of the men she saw on the night of the break-in. On a scale of 1 to 10 (1 being unsure of the suspect and 10 being positive of the suspect), Bond rated her identification as an 8. [Id.; Apr. 15, 2013, Supp. Investigation Report, Doc. 43-19; Apr. 15, 2013, Lineup Procedures, Doc. 43-20]. Officer Weeks then spoke about the case with his captain, who advised him to interview Quarles and ask him to take a polygraph. [Investigator's Notes, Doc. 39-8 at 1].

FCPD officers then made several unsuccessful attempts to contact Quarles in order to arrange the polygraph test.[5] [Investigator's Notes, Doc. 39-8]. Specifically, on June 5, 2013, Detective Williams spoke with Juneisha Quarles, Judeshiea Quarles' aunt, to obtain information regarding his whereabouts so that the polygraph test could be administered. [Id. at 1]. Ms. Quarles reported that she did not have any information on her nephew's

_____

[5] Quarles made no attempt to contact FCPD to take a polygraph test to clear his name. [Quarles Dep., Doc. 38-7 at 114, 160]. Additionally, Quarles left Forest City the same month of his conversation with Officer Shelton and moved to Gastonia to live with his sister without ever reaching out to FCPD to clear his name before doing so. [Id. at 157-60]. After living in Gastonia for only five to six months, Quarles then moved to Utah to live with a girlfriend. [Id.].

whereabouts and did not know his home address or telephone number. [Id.]. On July 24, 2013, another FCPD officer, Officer Greene, went to RCD Car Wash where Quarles was once employed to try to locate him. [Id. at 2]. Quarles was not there because his employment had been terminated. [Id.]. On that same day, Officer Weeks and Detective Williams located and spoke with Quarles' mother, who stated that she did not know his location. [Id. at 3]. Officer Weeks asked Quarles' mother to tell him to come to the police department to discuss the breaking and entering Lt. Shelton had already talked to him about, and Quarles' mother agreed. [Id.].

On July 24, 2013, Officer Weeks interviewed Amie Cooper, Ms. Shytles' friend, about the tire changing incident. The transcript[6] of that interview indicates that Cooper stated to Officer Weeks that the tire changing incident had occurred more than *one year* prior to the burglary, in January 2011:

> Weeks: Um, the reason we've got you here today is that there was some information, um, I think during the time you were – you and Chris [Crystal] Shytles were friends and maybe you had stayed with her some. There's some information that you had passed along to her several months back about a possible suspect who had been at her house. And

---

[6] The transcript itself is not dated, so it is unclear when it was prepared. It is also unclear who transcribed Cooper's interview, although it appears to have been prepared by the FCPD. [See Statement Form, Doc. 43-22].

> basically what I wanna do is just kind of start from the beginning and you just tell me what happened.

> \*     \*     \*

> Cooper: Okay, um, I was spending the night with Chris, it was during that time that my mother was ill, uh, for a couple of months, and she passed away not long afterwards. *I imagine it was sometime in January of 2011, my mother died in February of 2011.* Jeff had come by Chris' house and, um, the air had gone out of his tire, he had a flat tire. Um, his brother owned Iv[e]y's Pawn Shop –

[FCPD Statement Form, Doc. 43-22 at 2 (emphasis added)]. Cooper stated that after arriving with the air compressor, Quarles was in Shytles' home for approximately 10 to 15 minutes. [Id. at 4].

Officer Weeks' notes from that interview, however, mistakenly indicate that Cooper had stated that the incident had occurred just *a few weeks prior* to the burglary:

> [Cooper] identified "D" as Judeisha Quarles. She stated that Jeff Smith stopped by Chris [Crystal] Shytles' house and had a flat tire. Jeff called to Ivey's Pawn shop and Judeisha came down with an air compressor. He was inside the residence for at least 15 minutes. Once the tire was pumped, he left. *This was a couple of weeks prior to the B&E.*

[Investigator's Notes, Doc. 39-8 at 4 (emphasis added)].

On July 31, 2013, Officer Weeks appeared before Magistrate D. B. Gardner, who, after hearing all the facts presented to him, issued a warrant

for Quarles' arrest. [Warrant, Doc. 39-12]. When obtaining the warrant, Officer Weeks relied on the investigation notes contained in the file, which included the two statements from Shytles to the effect that her friend told her that Quarles had been in her house two weeks prior to the burglary, as well as Officer Weeks' erroneous note from Cooper's July 24, 2013 interview.[7] A transcript of Cooper's interview had not yet been prepared, and therefore Officer Weeks did not have that information with him. [Weeks Dep., Doc. 39-11 at 62-63]. Officer Weeks admitted at Quarles' criminal trial that he was "shocked" to learn that he written down the wrong date when interviewing Cooper. [Id. at 48]. He testified, however, that even if he had known that Quarles had been at Shytles' home a year prior to the breaking and entering, as opposed to a couple of weeks prior, he still would have sought a warrant for Plaintiff's arrest. [Id. at 48, 63].

Quarles was arrested on May 31, 2014 in Gaston County. A probable cause hearing was held on July 1, 2014 before Chief District Court Judge Randy Poole, at which Shytles, Bond, and Officer Greene testified. No testimony was offered at the probable cause hearing regarding Quarles' prior visit to Shytles' home. Instead, the testimony primarily focused upon Shytles'

---

[7] There is no affidavit in the record from Officer Weeks. It appears that he presented the factual basis for probable cause to the magistrate orally.

testifying as to the items stolen and Bond and Officer Greene testifying as to Bond's identification of Quarles as one of the persons she saw on the day of the break-in. After hearing the facts surrounding the crime, Judge Poole determined that probable cause existed for the case to proceed. [Transcript of Probable Cause Hrg., Doc. 39-13].

On September 15, 2014, Officer Weeks testified at a grand jury proceeding.[8] The grand jury returned an indictment against Quarles for breaking and entering and larceny. [Indictment, Doc. 39-14].

The criminal trial against Quarles began on June 9, 2015. At trial, Quarles called Cooper and Smith as witnesses, and each testified that Quarles had visited Shytles' home with the air compressor, just before Cooper's mother died in early February 2011. [Declaration of Baiba Bourbeau, Doc. 43-25 at ¶¶ 12-13]. The State then recalled Bond in rebuttal, who testified that she saw Quarles at the house two weeks before the break-in. [Id. at ¶ 16]. The trial judge allowed the case to proceed to the jury. [Id. at ¶ 17]. Ultimately, the jury returned a verdict of not guilty as to both counts. [Trial Transcript, Doc. 39-15 at 329].

---

[8] No transcript of this proceeding appears in the record.

## IV.    DISCUSSION

Qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation…." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).  The application of qualified immunity requires a two-part inquiry.  First, the Court must determine "whether a constitutional right would have been violated on the facts alleged." <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001), <u>overruled in part by</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009).  Second, the Court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  <u>Pearson</u>, 555 U.S. at 232 (citation omitted).  "In performing this analysis, however, a court is not required to consider the above two steps in any particular order.  A court may exercise its discretion to determine which of the two steps of the qualified immunity analysis 'should be addressed first in light of the circumstances in the particular case at hand.'" <u>Williams v. Ozmint</u>, 716 F.3d 801, 805-06 (4th Cir. 2013) (quoting in part <u>Pearson</u>, 555 U.S. at 236).  In the present case, the Court will exercise its discretion and first determine whether, viewing the forecast of evidence in the light most favorable to the Plaintiff, the facts show that the Defendant's conduct violated a constitutional right.  "If no constitutional right would have been violated were the allegations

established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

The Plaintiff alleges that his Fourth Amendment rights were violated when the Defendant "initiat[ed] a prosecution against Plaintiff without probable cause that terminated in Plaintiff's favor." [Am. Complaint, Doc. 5 at ¶ 3]. While "it is not entirely clear whether there is a separate constitutional right to be free from malicious prosecution, if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure." Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012) (quoting Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009)). "Thus, what has been inartfully termed a 'malicious prosecution' claim is simply a claim founded on a Fourth Amendment seizure that incorporates the elements of the analogous common law tort of malicious prosecution." Durham, 690 F.3d at 188 (citation and internal quotation marks omitted). To prevail on a malicious prosecution claim under § 1983, a plaintiff must prove "that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).

The Plaintiff is unable to establish a constitutional violation here. Although there were criminal proceedings that were ultimately terminated in the Plaintiff's favor, the undisputed forecast of evidence, when viewed in the light most favorable to the Plaintiff, shows that the prosecution was clearly supported by probable cause. "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002). Here, Bond identified the Plaintiff as one of the men she saw enter Shytles' house during the break-in. The Plaintiff denied ever being at Shytles' residence and offered to take a polygraph. However, when officers attempted to contact the Plaintiff to arrange that polygraph, he could not be reached, and his mother and aunt disclaimed any knowledge of his whereabouts. An officer could reasonably believe that the Plaintiff's sudden, unexplained absence shortly after being questioned about a potential burglary was suspicious and potentially indicative of guilt. In addition, Amie Cooper told Officer Weeks that the Plaintiff had previously been at Shytles' residence and gave a plausible explanation for his presence there (i.e., delivering an air compressor to his employer's brother). The significance of Cooper's statement about the Plaintiff's presence during this tire-changing incident is

not due to the timing of the incident (whether two weeks before the break-in as claimed by Bond or a year before as claimed by Cooper), but rather because Cooper's story completely contradicts the Plaintiff's statement to Lt. Shelton that he had not been involved in any such incident at Shytles' residence. All of these circumstances, when considered in their totality, give rise to a sufficient indicia of probable cause for the Defendant to have sought a warrant for the Plaintiff's arrest.

Even if there were some question as to whether the Defendant had sufficient probable cause to seek an arrest warrant, the subsequent issuance of the warrant as well as an indictment by a grand jury conclusively determines the issue. "It has long since been settled by the Supreme Court that an indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause." Durham, 690 F.3d at 189 (quoting in part Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975)) (internal quotation marks omitted). The conclusive effect of an indictment can be overcome only by evidence that an officer (1) "lied to or misled the prosecutor"; (2) "failed to disclose exculpatory evidence to the prosecutor"; or (3) "unduly pressured the prosecutor to seek the indictment." Evans, 703 F.3d at 647-48 (citations omitted).

Where, as here, a plaintiff alleges that an officer withheld evidence in order to obtain an arrest warrant, the Fourth Circuit has relied on the two-prong standard set forth in Franks v. Delaware, 438 U.S. 154, 155–56 (1978), to determine whether a Fourth Amendment violation has occurred. Under Franks, the Court must first determine whether the officer "deliberately or with reckless disregard for the truth . . . omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." Osborne v. Georgiades, 679 F. App'x 234, 238 (4th Cir. 2017) (citing Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007)). Second, the Court must determine whether such omissions are "necessary to the neutral and disinterested magistrate's finding of probable cause." Osborne, 679 F. App'x at 239 (citing Evans, 703 F.3d 636 at 650). In other words, the omission "must be such that its inclusion in the affidavit would defeat probable cause for arrest." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990).

Here, the Plaintiff alleges that the Defendant deliberately withheld certain "critical facts" from the magistrate in seeking an arrest warrant for the Plaintiff. Specifically, the Plaintiff contends that the Defendant deliberately failed to advise the magistrate: (1) that the Plaintiff only visited Shytles' home for ten to fifteen minutes, a full year before the break-in and (2) that Bond

had identified another black man as a suspect with more certainty just days after the break-in. [Doc. 43 at 22].[9] Even assuming that this information was not disclosed to the magistrate,[10] such disclosure would not have defeated probable cause. Whether the Plaintiff's visit to Shytles' residence occurred a year prior to the break-in, as opposed to only a few weeks prior, does not exculpate the Plaintiff in any way from the crime. Even a visit one year prior is still relevant to the probable cause calculus, especially in light of the Plaintiff denying ever having been on Arlington Street or having been involved in the changing of a tire. Thus, the inclusion of either of these omitted facts would not have defeated probable cause.

---

[9] The Plaintiff also contends that the Defendant's admission at his deposition -- that he was "shocked" to learn at trial about the discrepancy between his notes and Cooper's transcribed statement -- creates an inference that the inclusion of the correct information (that the Plaintiff was at Shytles' home a year before the break-in, not a few weeks before) would have "defeated probable cause." [Doc. 43 at 22]. While the Court must, at this stage in the proceedings, draw all *reasonable* inferences in the Plaintiff's favor, such an inference is not reasonable in light of the other indicia of probable cause in this case.

The Plaintiff further argues that the Defendant was "shocked" when confronted with this discrepancy at trial only because "his deliberate withholding of evidence was exposed by Quarles' criminal defense attorney...." [Id.]. The Plaintiff, however, has offered nothing more than speculation that the Defendant's failure to include such information was deliberate, particularly in light of the fact that Shytles had previously told both Lt. Shelton and the Defendant that Cooper had told her that the tire changing incident had occurred two weeks before the break-in, in February 2012.

[10] Again, the record does not indicate that any affidavit was presented to the magistrate, and none appears in the record. Rather, it appears that the Defendant orally presented the basis for probable cause to the magistrate in applying for the arrest warrant.

Moreover, the fact that Bond identified a different individual with more certainty is not exculpatory information. Bond consistently stated to police that there were *two* individuals involved in the break-in. Thus, the fact that Bond previously identified one individual as a perpetrator does not necessarily cast doubt on her identification of the Plaintiff as a perpetrator as well.

In short, the undisputed forecast of evidence establishes ample probable cause for the Plaintiff's arrest. Further, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the Defendant deliberately withheld material information in order to obtain an arrest warrant for the Plaintiff in the absence of probable cause. As such, the Plaintiff cannot establish that his arrest was "pursuant to legal process that was not supported by probable cause." See Durham, 690 F.3d at 190. For these reasons, the Court concludes that the Defendant is entitled to qualified immunity with respect to the Plaintiff's § 1983 claim, and this claim will be dismissed.

Because there was, as a matter of law, sufficient probable cause for the arrest, the Plaintiff's malicious prosecution claim under North Carolina law must fail. See Durham, 690 F.3d at 190; see also Martin v. Parker, 150 N.C. App. 179, 182, 563 S.E.2d 216, 218 (2002) (affirming dismissal of

malicious prosecution claim, noting "the presence of probable cause necessarily defeats plaintiff's claim"). Accordingly, the Plaintiff's state law claim will also be dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 36] is **GRANTED**, and the Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

A Judgment consistent with this Order will be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: December 12, 2018

Martin Reidinger
United States District Judge